**Billy Joe CRAIG and Betty A. Craig, Plaintiffs-Appellants,**

v.

**IOWA KEMPER MUTUAL INSURANCE COMPANY, Defendant-Respondent.**

**Nos. KCD 28153 and KCD 28154.**

Missouri Court of Appeals, Kansas City District.

April 3, 1978.

Motion for Rehearing and/or Transfer Denied May 1, 1978.

Application to Transfer Denied June 15, 1978.

Edward J. Murphy, Inc., Butler, Fred S. Selsor, Kansas City, for plaintiffs-appellants and plaintiffs-respondents.

Don B. Roberson, W. James Foland, Kansas City, for defendant-appellant Iowa Kemper Mutual Insurance Co. and for Defendant-Respondent Iowa Kemper Mutual Insurance Co.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

SHANGLER, Presiding Justice.

The plaintiffs Craig brought their petition in four counts on causes of action which arose from the uninsured motorists coverages of the liability policy issued to them by the defendant Kemper Mutual Insurance Company. The parties cross-appeal from adverse judgments entered severally.

These disputes derived from a collision of March 27, 1970 between Ward and Welborn which took the life of the infant Craig, son of the plaintiffs, then a passenger in the Ward automobile driven by the brother of Mrs. Craig. Ward was then an uninsured motorist and Welborn was insured by Allstate.

The parents Craig brought an action for the wrongful death of the child against both Ward and Welborn as joint tortfeasors. At the time of the casualty the plaintiffs Craig were insured under a liability policy issued by the defendant Iowa Kemper which, as required by Sec. 379.203, RSMo 1969, provided uninsured motorist coverage for $10,000 for a single injury or death. The plaintiffs notified the defendant Iowa Kemper that they claimed under that coverage and also under the medical payment provision of the policy. An attempt at negotiation followed but rancor between the attorneys foiled the effort. Iowa Kemper intervened in the litigation between the Craigs and tortfeasors Ward and Welborn but withdrew when Ward denied the Iowa Kemper request to direct the defense. On December 20, 1972, a jury returned a verdict of $23,500 for plaintiffs Craig against both Ward and Welborn. Iowa Kemper had offered the Craigs $7,500 to settle their claim against uninsured Ward before withdrawal from the litigation. The defendant Welborn filed a timely motion for new trial. The defendant Ward made no complaint of error and the judgment as to him became final.

Within thirty days of judgment [on January 5, 1973], Iowa Kemper offered the Craigs $9,500 in full settlement of their claim under the uninsured motorist coverage. The Craigs, however, demanded the

full $10,000 coverage but then, on February 12, 1973, after counsel discovered that the Iowa Kemper policy covered two automobiles, not only one, the Craigs withdrew all offer to settle. Thus it was that on February 14, 1973, the Craigs brought their petition in four separate counts against the defendant Iowa Kemper.

Count I sought recovery under the uninsured motorist coverage on the first Craig automobile for $10,000 plus interest from December 20, 1972 [the date of verdict against Ward and Welborn]. Count II sought to stack an additional $10,000 plus interest under the uninsured motorist coverage on the second Craig automobile. Count III sought recovery under Secs. 375.296 and 375.420, RSMo 1969, for statutory penalty and attorney fee for vexatious refusal to pay at least one of the uninsured motorist coverages in consequence of the December 20, 1972 verdict. Count IV sought recovery for actual and punitive damages for the tortious breach of duty by insurer Iowa Kemper to deal with the Craigs as policyholders in fairness and good faith.

After this petition was brought, Iowa Kemper on February 21, 1973, made formal payment of $10,100 to the circuit clerk in the wrongful death action against Ward and Welborn. That sum was meant as full acquittance of the Iowa Kemper liability under uninsured motorist coverage and for the interest accrued on the judgment, as calculated by the insurer.

While the Craig suit against Iowa Kemper pended, the Craigs sought and obtained [from the court with jurisdiction over their wrongful death action against Ward and Welborn] an order to approve a judgment in that cause[1], apportion damages and approve a partial satisfaction of the judgment. The transaction resulted in a $3,500 partial payment of the judgment by Welborn and reserved to the Craigs the balance of the judgment—or $20,000. This prompted Iowa Kemper to counterclaim for subro-

gation under the provisions of Sec. 379.203 against the Craigs for the $3,500 received by them in that suit as a setoff in the action between them on the uninsured motorist coverage.

The cause proceeded to trial to the court. After evidence, the plaintiffs had judgment for $10,000 plus interest from December 20, 1972 on Count I and for $10,000 without interest on Count II. The defendant had judgment on Count III for penalties for vexatious refusal to pay under the policy. The court had earlier entered summary judgment for the defendant on Count IV for bad faith conduct in the negotiation of settlement process. The court found for plaintiffs Craig on the Iowa Kemper counterclaim for subrogation.

The plaintiffs Craig appeal from the denial of interest on the judgment in Count II, from judgment against them on the Count III vexatious delay claim, and from the adverse summary judgment in the Count IV outrageous conduct claim. The defendant Iowa Kemper appeals on the contentions that the Craig settlement with the uninsured motorist without the consent of the insurer barred recovery under the express terms of the policy, and that the adverse judgment on the counterclaim was error.

## I

### Appeal by Plaintiffs

#### A

#### Denial of Interest on the Count II Judgment

■ The plaintiffs Craig contend the trial court erred in denial of interest on the $10,000 judgment. They argue that the liability of insurer Iowa Kemper under the policy was fixed by the verdict entered against Ward on December 20, 1972 and so interest on that count, as well as on the $10,000 judgment on Count I, properly runs from that date. The defendant Iowa Kem-

---

1. That court had earlier sustained the Welborn motion for new trial and, apparently, the approval of judgment was a reformulation of the

$23,500 verdict as a final disposition of that litigation.

per, however, was responsible to the Craigs under the policy to pay only the sums which the insured was *legally entitled to recover* as damages from an uninsured motorist. At the time judgment was entered against Ward the liability of an insurer for multiple payments to an insured for the uninsured motorist coverage on several cars under a single policy had not yet become a fixed principle of law. The doctrine that uninsured motorist coverage in a single policy, which by the terms are made to apply separately to each vehicle listed shall be stacked in favor of the insured, was not declared until our decision in *Cameron Mutual Insurance Company v. Madden* [No. 26556 adopted May 5, 1975] and decided on transfer by the Missouri Supreme Court en banc on February 9, 1976 and reported at 533 S.W.2d 538. Therefore, it was only after judgment was entered July 7, 1975 on Count II that the payment of the $10,000 uninsured motorist coverage on the second vehicle became a fixed liability of Iowa Kemper. The right to that recovery was not vested until determined by the trial court. Payment was not due until then, and neither was interest. The judgment on Count II is affirmed.

B

Vexatious Refusal Penalty

■ The plaintiffs Craig next contend that the denial of their claim for statutory damages under Secs. 375.296 and 375.420 was error. These sections provide that in

any action against an insurance company "to recover the amount of any loss under a policy" [§ 375.420] [2], where the company vexatiously and without reasonable cause refuses to pay, the court or jury may, in addition, allow damages not to exceed ten percent of the loss and a reasonable attorney fee. These statutes were enacted, not as an additional recovery, but that the amount due under the insurance policy shall be paid without arbitrary refusal or recalcitrant delay by the insurer. *Willis v. American National Life Insurance Company*, 287 S.W.2d 98, 105[11, 12] (Mo.App.1956). By the terms of Sec. 375.420 only those actions *ex contractu* and not *ex delicto*—even where the tort arises from contract—may recover penalties. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750, 756[6] (1950). Only an *insured* can suffer a loss under the statute, and not a third party who claims for a public liability. *Corder v. Morgan Roofing Co.*, 355 Mo. 127, 195 S.W.2d 441, 448[12–14] (1946). That is to say, only where performance under the policy flows directly from the insurer to the insured or his beneficiary do these statutes aid.[3] These actions are most aptly described as first party claims. Couch on Insurance 2d, § 23.11.

The obligation of insurer Iowa Kemper to pay $10,000 [4] to the Craigs under Part IV of the policy did not accrue merely because they proved a loss but only after the damage was adjudicated to result from the legal liability of the uninsured motorist [Ward]. Thus, the claim of the Craigs did

2. The petition pleads recovery under both Secs. 375.296 and 375.420. These sections are cast in parallel terms, but Sec. 375.296 has application only to an insurance company not authorized to do business in this state, and so has no application to this case. *Willis v. American National Life Ins. Co., infra*, l.c. 102. Only the application of Sec. 375.420 remains genuinely in issue.

3. *Aufrichtig v. Columbian Nat. Life Ins. Co.*, 298 Mo. 1, 249 S.W. 912 (1923) [accidental injury insurance policy]; *Willis v. American National Life Insurance Company*, 287 S.W.2d 98 (Mo.App.1956) [life insurance policy]; *Rohlfing v. State Farm Fire and Casualty Company*, 349 S.W.2d 472 (Mo.App.1961) [fire and explosion policy]; *Housing Authority of Clin-*

*ton v. Baumann*, 512 S.W.2d 436 (Mo.App. 1974) [contractor's bond]; *Fohn v. Title Insurance Corporation of St. Louis*, 529 S.W.2d 1 (Mo. banc 1975) [title insurance policy]. A more complete catalogue of coverages entitled to the protection of these statutes is found in the annotation of Sec. 375.420, notes 78 et seq.

4. The claim of the Craigs for statutory penalties is confined to failure to pay only one uninsured motorist coverage [$10,000] because the principle which allows a claimant to stack the uninsured coverages of multiple vehicles described in a single policy was not declared until *after* judgment was entered for the Craigs on Counts I and II of their petition against Iowa Kemper.

not become *a loss under the policy* within the terms of Sec. 375.420—and so payable directly from the insurer to the insured—until the legal cause for the injury first was fixed on the uninsured motorist. Only then did the claim become *a loss under the policy*, and so, *ex contractu*—in this case, when final judgment was entered on the verdict of December 20, 1972 against Ward.

The provisions of uninsured motorist coverage reorder the normal postures between an insured and an insurer. They transform, in a singular way, the nominal insured into a third-party claimant and the nominal uninsured motorist into the actual insured. That is because to prove a claim under Part IV coverage the nominal insured must show the legal liability of the uninsured motorist. The insurer, for its part, in effect insures the uninsured motorist to the extent of the policy limits and so seeks to exonerate the uninsured motorist of liability to avoid payment to the policy insured. Put simply, the nominal insured and the insurer under this coverage are placed in an adversary relationship. *Baxter v. Royal Indemnity Company*, 285 So.2d 652, 656 (Fla.App.1973); Pretzel, Uninsured Motorists p. 121 (1972). Once the liability of the uninsured motorist has been adjudicated, the policy insured and the insurer are restored, not merely to their actual relationship, but to that of creditor and debtor as well. Couch on Insurance 2d § 23:11, p. 12. The claim then becomes *a loss under the policy* and vexatious refusal of the insurer to pay the loss becomes actionable under Sec. 375.420.

The conduct of the insurer which the Craigs contend proves the vexatious delay encompasses two episodes: (1) the negotiations to settle the wrongful death claim during the pendency of that action against uninsured motorist Ward and joint tortfeasor Welborn, and (2) the refusal to pay one $10,000 uninsured motorist coverage after judgment was entered on the $23,500 verdict against both tortfeasors.

The first of them rests on evidence of angry and discourteous responses by counsel for Iowa Kemper to the demand by the Craigs for payment of $10,000 on a virtually conceded liability. Counsel for the insurer first offered $5,000, then $7,500 and finally, after verdict but before judgment, $9,500 in settlement of the wrongful death claim against the uninsured motorist Ward. In the course of that exchange, counsel threatened to allow the Craig claim to go to judgment against Ward and thus force him into bankruptcy [presumably to embarrass Betty Craig—his sister] and so induce the plaintiffs to a disadvantageous settlement. In that course, also, Iowa Kemper first intervened to defend the uninsured motorist Ward but then withdrew from the litigation when Ward refused that gesture. These transactions, however, were not those of an insured against an insurer on a policy, but those of a third-party [albeit a nominal insured] who claimed against an insurer for the liability of an actual insured. Such conduct, however vexatious, does not arise upon a contract of insurance and allows no recovery under Sec. 375.420.

The other episode relates to conduct of the insurer after the $23,500 return of verdict against Ward and Welborn. On January 5, 1973, after the December 20, 1972 verdict but before the judgment against Ward—who filed no after-trial motion—became final, Iowa Kemper offered the Craigs $9,500 in full settlement under the uninsured motorist coverage. On February 5, 1973, counsel for plaintiffs once again demanded $10,000. Then, on February 12, 1973—presumably when the description of the second vehicle was discovered in the policy—counsel for the Craigs withdrew all previous offers. Thereafter, on February 21, 1973—more than thirty days after the Craig judgment against uninsured motorist Ward for $23,500 became final—Iowa Kemper formally paid $10,100 into the registry of the court in acquittance of its calculated $10,000 indebtedness under the uninsured motorist coverage plus $100 interest earned on the judgment.

In consonance with explicated principles, the claim on the uninsured motorist coverage of the policy did not accrue to the Craigs against Iowa Kemper until the judgment against Ward became final on Janu-

ary 19, 1973. Then for the first time the Craigs became *insureds* under the uninsured motorist provision of the policy within the meaning of Sec. 375.420. Only then did their claim become *a loss upon a policy—ex contractu*—entitled to payment by Iowa Kemper without unreasonable delay. That obligation was actually discharged on February 21, 1973, a lapse of some thirty-three days after final judgment and indebtedness. At that time, however, the Craigs had withdrawn all demands, and refused to draw payment from the court clerk on the contention that the tender was only conditional. It remains apparent, however, that the Craigs and Iowa Kemper were then in the throes of a legal quandary—whether the uninsured motorist coverage on the multiple vehicles could be stacked—and that refusal of the tender was prompted by uncertainty as to whether such was a valid contractual right. The insurer paid into court—albeit tardily—its good faith calculation of total indebtedness under the policy as the law then stood; but it was concern lest acceptance of the single $10,000 coverage compromise their claim to the second coverage that prompted the Craigs to reject the tender. In a word, there was no refusal to pay the proceeds of the policy, only a refusal to accept. The judgment of the circuit court which denied recovery to the Craigs under Sec. 375.420 rests on the logic of the circumstances and the exercise of that discretion will not be disturbed. *Shirrell v. Missouri Edison Company*, 535 S.W.2d 446, 448 (Mo. banc 1976); *St. Clair v. Washington Fidelity Nat. Ins. Co.*, 89 S.W.2d 85, 88[3–5] (Mo.App.1936).

### C

### Tortious Failure of Iowa Kemper To Negotiate in Good Faith

The plaintiffs also appeal from the summary judgment entered by the trial court against them on Count IV. That pleading alleges the relationship of insured and insurer between the Craigs and Iowa Kemper, the refusal by the insurer to pay at least one of the uninsured motorist coverages to the Craigs, that the insurer owed the Craigs the duty of good faith and fair dealing in the discharge of the insurance policy obligations, that the refusal of Iowa Kemper to pay that coverage was willful, wanton and in conscious disregard of these rights, that the Craigs incurred additional litigation expense on that account and were entitled to actual and punitive damages.

Thus, both Count III and Count IV plead recovery for failure of the insurer to make payment under the policy to the insured in good faith, one *ex contractu* on an obligation created by statute, and the other *ex delicto* on an obligation implied by law. We need not consider whether the remedy of Sec. 375.420 precludes the tort cause of action [see: *Leonard v. Fireman's Ins. Co. of Newark, N.J.*, 100 Ga.App. 434, 111 S.E.2d 773 (1959)] because, for reasons given, there was no relationship of insurer and insured—essential to the tort recovery as pleaded—at the time of the bad faith conduct alleged.

The general jurisprudence recognizes that a policy of insurance imports the utmost good faith by the insurer to perform according to its terms. This principle extends to imply a covenant of good faith and fair dealing from every contract of insurance. The law thereby assumes the agreement of an insurer not to injure the right of an insured to receive the benefits of the contract. Couch on Insurance 2d, § 23:8 (Supp. p. 8). The courts apply this principle of an implied good faith [by whatever designation] to give an insured a remedy both on the policy—*ex contractu*—and in tort.

As applied to a first party claim *on the policy*, the covenant facilitates an insured to recover the benefits payable directly to him by the contract.[5] *Bowler v. Fidelity & Cas-*

---

5. Those courts which adopt the principle enforce the implied covenant of good faith to give effect to the reasonable expectations of the insured on the obligations assumed by the insurer directly to him. Couch on Insurance 2d, § 23:11 (Supp. p. 8). Our law does not recognize the implied covenant, as such, but gives that redress by canons of construction, but as to those first party claims by the insured on the contract [see note 3 *infra* ], § 375.420 creates a

ualty Co. of New York, 53 N.J. 313, 250 A.2d 580, 587[14–17] (1969); *Law v. Hawaiian Life Insurance Co.*, 51 Haw. 288, 459 P.2d 195, 197[1] (1969). As applied to a third party claim for the liability of an insured, the covenant imposes on an insurer which assumes control over the proceedings against the insured the duty of good faith to settle the claim within the policy limits and allows recovery in tort to the insured for breach of that duty. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750, 753[2] (1950); Appleman, Insurance Law & Practice, §§ 4711–12 (supp.).

■ The cause of action in tort for breach of the obligation of fair dealing presupposes an insurer and insured in a subsistent fiduciary relationship. *Rova Farms Resort, Inc. v. Investors Ins. Co. of America*, 65 N.J. 474, 323 A.2d 495, 505[4–6] (1974); *Baxter v. Royal Indemnity Co.*, 285 So.2d 652, 656 (Fla.App.1973); *Howard v. State Farm Mutual Auto Ins. Co.*, 60 Wis.2d 224, 208 N.W.2d 442, 443[1] (1973); *Garner v. American Mutual Liability Ins. Co.*, 31 Cal.App.3d 843, 107 Cal.Rptr. 604, 607[1–4] (1973). The uninsured motorist provision of the policy [Part IV] does not purport to place the Craigs and Iowa Kemper in that posture of an insured and insurer in a relationship of trust essential to the creation of a duty of good faith answerable in tort. The mere relationship of insurer and insured does not import an obligation of trust. Rather, in the absence of special circumstances, the relation between the parties to a contract of insurance is that of debtor and creditor. *Moses v. Manufacturers Life Insurance Company*, 298 F.Supp. 321, 323[4] (D.C.S.C.1968); *Stockett v. Penn Mutual Life Ins. Co.*, 82 R.I. 172, 106 A.2d 741, 743[5] (1954); *Walsh v. Campbell*, 130 Ga. App. 194, 202 S.E.2d 657, 661[4] (1973); Couch on Insurance 2d, § 23:11.

■ At the time of the bad faith conduct by Iowa Kemper against the Craigs alleged

in County IV, they were neither in a relationship of actual insurer and insured nor bound together in trust. As our prior discussion explains, the Craigs were then in the position of third parties who claimed against the liability of Ward and so adversely against Iowa Kemper. The actual relationship of insurer and insured was not restored until that liability was adjudicated. Nor was there a relationship of trust between them.

The fiduciary duty of an insurer for good faith rests on the reservation of exclusive right to contest or negotiate the claim of liability brought against the insured, and so withhold from the insured the right to settle without consent of the insurer. *Zumwalt v. Utilities Ins. Co., supra*, l.c. 753[2]. Such terms of agreement repose in the insurer the power to act for the insured, akin to authority a client vests in an attorney, or a principal in an agent—each a relationship of inherent fiduciary obligation. *Rova Farms Resort, Inc. v. Investors Ins. Co. of America, supra*, l.c. 505[6]; *Baxter v. Royal Indemnity Company, supra*, l.c. 655[4–6]; Appleman, Insurance Law & Practice §§ 4711 and 4712. The duty to deal in good faith, therefore, does not arise from consent and contract but from the nature of the relationship. *Rova Farms Resort, Inc. v. Investors Ins. Co. of America, supra*, l.c. 505[6]; *Zumwalt v. Utilities Ins. Co., supra*, l.c. 753[2]; *Richardson v. Employers Liability Assurance Corp.*, 25 Cal.App.3d 232, 102 Cal.Rptr. 547, 552[1–4] (1972).

The uninsured motorist provision of the contract [Part IV Coverage J] is the agreement of Iowa Kemper "to pay all sums which the insured [the Craigs] shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile". These contract terms place the policy insured [the Craigs] in the posture of a member of the public who seeks recovery for injury from the negligence of a motorist [uninsured motorist Ward] whose liability is

substantive cause of action for penalty against the insurer for unreasonable delay from a failure of good faith. Thus, our law not only requires an insurer to meet the reasonable expectations of the insured on the contract, but

by the statute shifts the expense of delay in payment of the claim onto the insurer. *Willis v. American National Life Insurance Co., supra*, l.c. 107.

724

insured by Iowa Kemper. This agreement creates no special relationship between the policy insured and the insurer but only the mere contract to pay damages up to the policy limits upon determination that the uninsured motorist is legally liable for the injury to the policy insured. No independent duty of good faith and trust accrues to the policy insured under this coverage. The very contrary results: under the uninsured motorist provision the policy insured and the insurer becomes adversaries who deal with wariness, not principal and agent who deal with trust. *Baxter v. Royal Indemnity Company, supra,* l.c. 656; *Walsh v. Campbell, supra,* l.c. 662[5]. The postulate which creates an independent duty of good faith between a liability insurer and the policy insured has no validity as to uninsured motorist coverage. That duty rests on a fiduciary relationship which results from the enforced surrender to the insurer of control of litigation brought against the insured— and which allows redress to the insured where failure of the insured to negotiate in good faith subjects the insured to excess liability.

The ·policy insured under the uninsured motorist coverage does not yield control of the litigation to the insurer. The refusal of the insurer to settle the claim of the policy insured under such coverage cannot expose him to the risk of judgment in excess of liability simply because the policy insured is not exposed to liability. An excess judgment against the uninsured motorist can only benefit, not endanger, the policy insured.

There can be no tort in the absence of a duty, and no duty of good faith by an insurer to an insured in the absence of a fiduciary relationship between them. The allegations of Count IV do not plead a duty of good faith by Iowa Kemper to the Craigs to settle the claim under the uninsured motorist provision which the law recognizes. While the liability of the uninsured motorist to the Craigs remained unadjudicated, Iowa Kemper had no more duty of good faith to the Craigs than to any other third-party claimant.

The Craigs contend, however, that their claim must be treated as that of a first party against the insurer and asks that the question which the court in *Dyer v. General American Life Insurance Company,* 541 S.W.2d 702 (Mo.App.1976), did not reach be determined to allow an insured a cause of action in tort against an insurer for failure to settle the claim payable by the policy terms directly to the insured. *Dyer* was a claim by an insured under an individual accident policy for actual and punitive damages for the bad faith refusal by the insurer to pay disability benefits. The court noticed that the cause of action attempted had no precedent in our law and, in any event, that the bad faith was not sufficiently pleaded—and so sustained dismissal of the petition. We have determined that under the terms of the uninsured motorist provision, no benefit accrued to the Craigs directly against Iowa Kemper until the liability of uninsured motorist Ward had been adjudicated in favor of the Craigs. Only then, we restate, did a claim accrue to the Craigs directly against Iowa Kemper *on the policy.* In the sequence of this litigation, the Craigs owned that benefit thirty days after the judgment of December 20, 1972; but that failed, not because of a bad faith refusal by Iowa Kemper, but because the Craigs chose not to accept the tender lest they compromise the claim to a duplicate coverage—then still *a matter of doubtful entitlement.* We do not say whether a bad faith refusal by an insurer of a benefit owed directly to an insured on a policy can support an action in tort, but only that the tenor of our law suggests otherwise.

The summary judgment on Count IV of the petition was properly entered and is affirmed.

II

Appeal of Defendant

A

Effect of Policy Settlement Exclusion Provision

At the trial Iowa Kemper contended that whatever liability was otherwise owed to

the Craigs under Part IV of the policy [Protection Against Uninsured Motorists] by virtue of their judgment against Ward was prevented by their failure to comply with Exclusion (b) provision:

Exclusions: This policy does not apply under Part IV:

. . . . .

(b) To bodily injury to an insured with respect to which such insured, his legal representative, or any person entitled to payment under this coverage, shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor . . .

The plaintiffs Craig settled with the joint tortfeasor Welborn for $3,500 as documented by the approval of judgment and approval of partial satisfaction by the trial court, and the partial release by the Craigs. These transactions were without the consent of Iowa Kemper. The insurer relies on *Kisling v. MFA Mutual Ins. Co.*, 399 S.W.2d 245 (Mo.App.1966) for the validity of the policy exclusion.

The consent exclusion before the *Kisling* court prevented uninsured motorist coverage recovery for bodily injury where the insured [l.c. 248] " . . . without the written consent of [the insurer], ma[de] any settlement with, or prosecute[d] to judgment any action against any person or organization who may be legally liable therefor." Thus, the *Kisling* exclusion prohibited both settlement *and* litigation of a claim to judgment without the consent of the insurer. The court separated these injunctions. As to the judgment prohibition, *Kisling* found [l.c. 249] that the exclusion tended to oust the jurisdiction of courts and deny resort to remedy in violation of Sec. 435.010, and so void as contrary to public policy. As to the settlement prohibition, *Kisling* noted first [l.c. 251] that uninsured motorist coverage was only contractual, and so no public policy prevented an insured from agreement to the consent of the insurer before settlement with the person legally liable for the injury—or forego the benefits of coverage. *Kisling* concluded [l.c. 252]

that in the absence of a contrary public policy or other prohibition of law, the parties to a contract are free to condition or limit their undertaking, even to the forfeiture of benefits, as they will.

■ A statute has since been enacted [Sec. 379.203, Laws of 1967 as amended by Laws of 1971] which mandates that no automobile liability insurance policy may issue in Missouri unless the coverage provides for recovery by an insured for bodily injury or death from the legal liability of an uninsured motorist in not less than the limits defined in Sec. 303.030. This means that the public policy of Missouri now declares that the minimum benefits defined in Sec. 303.030, without diminishment, shall be available to an insured injured by an uninsured motorist. It means also that an insurance policy provision which designs to restrict the insured from these benefits evades the purpose of the statute and is void as against public policy. *Steinhaeufel v. Reliance Ins. Companies*, 495 S.W.2d 463, 468[4, 5] (Mo.App.1973); *Webb v. State Farm Mutual Automobile Ins. Co.*, 479 S.W.2d 148, 152[5] (Mo.App.1972).

■ Exclusion (b) under Part IV of the policy abridges the mandatory minimum coverage of Secs. 379.203 and 303.030 for recovery against an uninsured motorist legally liable for the injury. The obligation of the insurer under Sec. 379.203, as well as under the uninsured motorists provision of the policy, was to pay all sums [within the limits of Sec. 303.030] which the insured shall be legally entitled to recover as damages from injury or death from the uninsured motorist. The law creates a source of compensation for the person injured by the tortious operation by an owner or operator of an uninsured motor vehicle. The right to the full damages [within the limits of Sec. 303.030] proved from the legal liability of the uninsured motorist is mandatory under the statute and may not be impaired by policy exclusion. The consent prohibition attempts to make a mandatory obligation of full coverage only conditional. In effect, the policy exclusion only chills settlements with joint tortfeasors to the detriment of

the injured person and subserves no legitimate purpose of the insurer. This policy exclusion, when applied to tortfeasors other than the uninsured motorist, restricts the mandatory coverage under the statute, and is void. *Hawaiian Insurance & Guaranty Co. v. Mead*, 14 Wash.App. 43, 538 P.2d 865, 867[1] (1975); *Harthcock v. State Farm Mutual Automobile Ins. Co.*, 248 So.2d 456, 459[4] (Miss.1971).

### B

### The Iowa Kemper Claim To Subrogation

 The plaintiffs Craig made a partial settlement and release with joint tortfeasor Welborn for $3,500 and satisfied the judgment against Ward and Welborn to that extent. Iowa Kemper contends that § 379.-203.4 entitles an insurer to reimbursement from the proceeds recovered by an injured person from a joint tortfeasor. That section provides:

> In the event of payment to any person under the coverage required by this section . . . the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement, or judgment resulting from the exercise of any rights of recovery of such person against *any person* . . . legally responsible for the bodily injury for *which such payment is made* . . . [Emphasis added]

The argument of Iowa Kemper assumes that the *person legally responsible* includes a joint tortfeasor. It is clear, however, that the right of reimbursement the statute describes is by subrogation, and that the *person legally responsible* describes the uninsured motorist for whose delict the insurer has paid, and not the joint tortfeasor. *State ex rel. Manchester Ins. & Ind. Co. v. Moss*, 522 S.W.2d 772, 775[7] (Mo. banc 1975); *Kroeker v. State Farm Mutual Automobile Insurance Company*, 466 S.W.2d 105, 110[6] (Mo.App.1971); *Harthcock v. State Farm Mutual Automobile Insurance Company, supra*, l.c. 459[3]. This provision supports the dominant statutory purpose that coverage for injury by an uninsured motorist shall not be diminished by agreement or

device. Accordingly, Iowa Kemper has no claim against the proceeds received by the Craigs from joint tortfeasor Welborn. The recourse of such an insurer against a joint tortfeasor is not by subrogation, but by contribution. Sec. 537.060. The counterclaim was properly denied.

The judgment of the court on Counts I, II, III and IV of the Craig petition and on the counterclaim of Iowa Kemper is affirmed in each respect. The costs are assessed against the parties equally.